UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X

**273 LEE AVENUE TENANTS ASSOCIATION,**
an unincorporated association, by and in the name of
its President, **CINDY SANCHEZ,**
and members **SARA OYOLA** and
**KATHLEEN SANTIAGO,**

Civil Action No.:

**COMPLAINT**

*Plaintiffs,*

-against-

**NAFTALI STEINMETZ** and
**273 LEE REALTY, LLC**

*Defendants.*
------------------------------------------------------------------- X

Plaintiff 273 Lee Avenue Tenants Association, through its attorneys, Brooklyn Legal

Services Corporation A, by Gregory Louis, Sara Wolkensdorfer, and Shekar Krishnan, Esqs.,

and Patterson Belknap Webb & Tyler LLP, by Courtney Finerty and Frederick Warder III, Esqs.,

complain against Defendants Naftali Steinmetz and 273 Lee Realty, LLC, alleging to this Court

as follows:

## INTRODUCTION

1.      This case seeks to remedy one a landlord's relentless attempts to expel all Latino

tenants from a rent-stabilized building by blatantly disregarding their rights as rent-stabilized

tenants in order to force them out.  The larger question at stake, however, is whether South

Williamsburg, a neighborhood within Brooklyn, New York, can retain true residential integration

and a balance in living patterns.[1]

2.      When Plaintiffs Sara Oyola, Kathleen Santiago, and Cindy Sanchez, and their

respective families, the current members of Plaintiff 273 Lee Avenue Tenants Association,

---

[1] *See Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205 (1972).

1

moved into 273 Lee Avenue, the eight (8)-unit building they have all called home for over twenty years, they were immersed in a microcosm of diversity; during the week, members of the Latino community went to Jewish factories interspersed throughout the neighborhood and worked with, and alongside, members of the Jewish faith; every Sunday, residents of Bedford-Stuyvesant, one of the adjacent neighborhoods, would cross over Flushing Avenue and visit their local Baptist Church, located across the street from 273 Lee Avenue.  Whenever Plaintiffs Oyola and Santiago, and the young Plaintiff Sanchez, walked through their neighborhood, they greeted relatives, saw friends and members of the Latino community, and passed by bodegas, delis, and shops in English, Spanish, and Yiddish.

3.    Today, Plaintiffs Oyola, Santiago, and Sanchez, and their respective families, are the only Latino tenants remaining not only in their building, but on their entire block and beyond; now, the area is almost entirely inhabited by members of the Hasidic Jewish community. Where these three women and their families used to visit and be visited by friends and family members living on nearby Lynch Street, they now have few members of their community to socialize with after those friends, family, and community members were displaced from their homes; where Plaintiff Oyola used to bring her daughter to play in PS 380's school yard, she is now told by Hasidic Jewish residents to leave when she brings her grandson to this same place; and, where these three women and their families experienced diversity, they are now told to leave storefronts and shops that are largely, if not entirely, in Yiddish.

4.    Changes for all of the Latino tenants residing at 273 Lee Avenue, the building at issue in this case, began in late 1995 and 1996, when the widow of the previous owner, Santos Lopez, sold the building to 273 Lee Holding Corporation  after Mr. Lopez's death in August

1994.[2]    On information and belief, 273 Lee Holding Corporation, and all other subsequent owners of the building, have been, and are, Hasidic Jewish.[3]

5.    In 1998, after living several years without repairs, all of the Latino tenants residing at 273 Lee Avenue, including Plaintiffs Oyola, Santiago, and Sanchez, and their respective families, formed the 273 Lee Avenue Tenants Association.

6.    In early 2006, Defendant 273 Lee Realty, LLC purchased the property, an LLC of which Defendant Naftali Steinmetz is the sole member.[4]

7.    After years of neglect, fights in Brooklyn Housing Court for repairs, and incessant harassment to take buyout offers, Latino families residing at the building grew weary and began to move out:  In 2009, Plaintiff Oyola's brother, Sergio Sanchez, who lived in Apartment 2L with his family, accepted a buyout offer.  In 2010, Plaintiff Oyola's sister, Silvia Monzano, and her family, moved out of Apartment 3R under the same set of circumstances; Plaintiff Oyola's cousin, Juana Moreno, who lived in Apartment 4R with her family, and Ortilio Herrera, who lived in Apartment 2R, moved out in 2010 and 2012, respectively.

8.    Upon information and belief, each Latino family that moved out was replaced with a Hasidic Jewish one.  By 2012, Plaintiffs Oyola, Santiago, and Sanchez, along with their

---

[2] According to publicly available documents, the Executor of Santos Lopez's estate deeded the property to 273 Lee Holding Corp, signed for by its President, Shimon Tabak, in September 1995.  Approximately one year later, in October 1996, 273 Lee Holding Corp deeded the property to GHT Realty Corp, signed for by its President, Haskel Jacobs.

[3] The first person Plaintiff Oyola remembers interacting with after the death of Mr. Santos was Mr. Jacobs of GHT Realty Corp, with whom she signed a two-year renewal lease in 1996; Plaintiff Oyola also remembers interacting with a Mr. Laskar.  Furthermore, Plaintiff Sanchez and her father, Gaspar Sanchez, remember dropping off rent checks at 158 Bedford Avenue, Brooklyn, New York 11211, which was the address of Able Management Co., the managing agent as of November 1996.  People working in this office told Mr. Sanchez that the owner was Hasidic Jewish.  The only owners after GHT Realty Corp. were/are Defendant 273 Lee Realty, LLC, of which Defendant Naftali Steinmetz is the sole member, and Defendant Steinmetz, a natural person.

[4] According to publically available records, Defendant 273 Lee Realty, LLC mortgaged the premises to New York Community Bank in March 2006.  The mortgage was signed by Defendant Steinmetz as the sole member of the Defendant LLC.

respective families, were the only Latino families still living at the Premises (as defined in paragraph 12 below).

9.      As the remaining Latino tenants and current members of Plaintiff 273 Lee Avenue Tenants Association, Plaintiffs Oyola, Santiago, and Sanchez, and their respective families, have seen only individuals who, on information and belief are Hasidic Jewish, moving in and out of apartments at the Premises.  These Hasidic Jewish tenants are transient, and move every two to three months, at which time new tenants, who on information and belief are Hasidic Jewish, move in.

10.     Since at least 2006, when Defendants took over ownership of 273 Lee Avenue, Plaintiffs have experienced discrimination at the hands of Defendants and Defendants' agents, and have been treated differently from, and in an inferior manner to, their Hasidic Jewish neighbors.  Defendants' discriminatory conduct is exemplified, among other things, by:  a decade-long pattern of inadequate, faulty, or nonexistent repairs, such as Defendants' failure to provide heat to Plaintiffs during at least two (2) seasons of winter, as a means of forcing Latino tenants to leave deplorable and unlivable conditions; explicit statements made by Defendants' agents regarding their intention to rid the building of all Latino tenants; and commencing litigation in Housing Court as a method of harassment, such as the  ongoing five-year-long owner's use holdover eviction proceeding.

11.     Plaintiffs bring this lawsuit challenging Defendants' actions as violations of the Fair Housing Act, the New York State Human Rights Law, the New York City Human Rights Law, and the Civil Rights Act of 1866, which include: purposefully failing to maintain satisfactory living conditions for Plaintiffs and all Latino tenants, under the law; commencing pretextual litigation and use of harassment tactics to aid in the removal of all Latino tenants,

4

namely Plaintiffs, from the Premises; and treating all Latino tenants, namely Plaintiffs, differently from, and inferior to, the Hasidic Jewish tenants, in terms of repairs and services.

## PARTIES

12.    Plaintiff 273 Lee Avenue Tenants Association ("Tenants Association") is comprised of Plaintiffs Sara Oyola, Kathleen Santiago, and Cindy Sanchez, and their respective families. Since being founded in 1998, the Tenants Association's members have included all Latino residents of the rent-stabilized apartment building 273 Lee Avenue, Brooklyn, New York 11206 ("the Premises").[5] Plaintiff Oyola and Plaintiff Sanchez's father, Gasper Sanchez, are immigrants from Mexico. Plaintiff Santiago is of Puerto Rican descent and receives benefits for "low-income" families as defined under federal law.

13.    Plaintiffs Oyola, Sanchez, and Santiago are all citizens of the United States.

14.    Defendant Naftali Steinmetz ("Steinmetz") is the owner of the Premises. On information and belief, Defendant Steinmetz is Hasidic Jewish.

15.    Defendant 273 Lee Realty, LLC is a domestic limited liability company that first purchased the Premises in February 2006, and is solely owned by Defendant Steinmetz, as further explained in the "Facts" section below.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. Sections 1331 and 1343, 42 U.S.C. Section 1982[6], and 42 U.S.C. Section 3601, *et seq.* It has jurisdiction over state claims pursuant to 28 U.S.C. Section 1367.

---

[5] For the purposes of clarity, "Tenants Association" refers to Plaintiff 273 Lee Avenue Tenants Association, which is currently made up of Plaintiffs Sara Oyola, Kathleen Santiago, and Cindy Sanchez, and their respective families.

[6] As construed in *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968).

5

17.     Venue is proper in this Court pursuant to 28 U.S.C. Section 1391(b)(2) because it lies in the judicial district where a substantial part of the events or omissions giving rise to the claims occurred and where the property that is the subject of this action is situated.

## FACTS

### A.     Factual History of Parties

18.     In February 2006, Defendant 273 Lee Realty, LLC, of which Defendant Steinmetz is the sole member, purchased the Premises.[7]

19.     In December 2010, according to publicly available documents, Defendant Steinmetz became the natural owner of the Premises.  Defendant 273 Lee Realty, LLC, by and through its sole owner, Defendant Steinmetz, transferred title of the Premises to Defendant Steinmetz as a natural person for zero (0) dollars.

20.     In 1998, all of the Latino tenants of the Premises founded and formed the 273 Lee Avenue Tenants Association, an unincorporated but organized group of tenants seeking to establish, through collective action, a functioning landlord-tenant relationship, most specifically, ensuring the habitability and proper maintenance of their building and their homes.[8]

21.     The Tenants Association was formed with the assistance of, and has been represented by, Southside United HDFC, colloquially known as "Los Sures," a community-based organization that helps local, low-income residents become aware of, and enforce, their housing rights.

---

[7] *See supra*, Note 3.

[8] Since its inception, the Tenants Association has been open to all tenants living at the Premises, including non-Latino tenants.  Signs regarding Tenants Association meetings were always conspicuously posted throughout the common areas at the Premises, asking all tenants to attend.

22.     The original Tenants Association consisted of:  Plaintiff Sara Oyola (Apartment 1L); Plaintiff Kathleen Santiago (Apartment 1R); Plaintiff Cindy Sanchez's mother and father, Gaspar and Julia Sanchez (Apartment 3L); Moses Sanchez (Apartment 4L); Silvia and Antonio Monzano (Apartment 3R); Celia and Sergio Sanchez (Apartment 2L); Juana Moreno and Oscar Melendez (Apartment 4R); and, Ortilio Herrera and Elia Duram (Apartment 2R), and their respective families, all of whom are Latinos.

23.     Moses Sanchez lived in Apartment 4L until 2001, when he and his family moved out due to a death in the family that was a direct result of the September 11, 2001 terrorist attacks.

24.     While remaining locked and dormant, Apartment 4L was slowly renovated until 2009, when it was occupied by the first Hasidic Jewish resident at the Premises.

25.     Silvia and Antonio Monzano moved into Apartment 3R of the Premises in or around 1985 and lived there with their family until in or around 2010.

26.     Ms. Monzano was offered a buyout two (2) times by one of Defendants' male workers, who was responsible for maintaining the Premises' plumbing system and making general repairs A the Premises.  Mr. Monzano refused the first offer of twenty-thousand (20,000) dollars.

27.     In or around 2010, however, after years of not getting repairs made to their apartment, members of the Monzano household agreed to take the second buyout offer of fifteen-thousand (15,000) dollars. On information and belief, the individual who paid them was Hasidic Jewish and an agent of Defendants.

7

28.    When the Monzanos accepted the buyout offer, several severe conditions of disrepair existed in their apartment, including but not limited to, failure of the owner to paint the apartment, and failure to repair or replace pipes that frequently broke.

29.    That same year, a male worker for a management company unknown by the individual Plaintiffs, renovated Apartment 3R, and another Hasidic Jewish tenant moved in.

30.    Celia and Sergio Sanchez lived in Apartment 2L with their family until 2010. Ms. Celia Sanchez and her family moved out under a similar set of circumstances as those faced by the Monzano family.

31.    Ms. Sanchez was offered a buyout several times by an individual who said he worked for the owner of the Premises. The same individual told Ms. Sanchez that the owner wanted the apartment for his family.

32.    Ms. Sanchez and her family rarely, if ever, received repairs in their apartment. When Defendants' workers did make repairs, their work was haphazard, and they made incomplete and shoddy repairs that did not permanently fix the defect.

33.    Specifically, Ms. Sanchez's floor was severely cracked and broken, after suffering from persistent and extreme water damage. Throughout the entire apartment, there were holes in the cracked and visibly dangerous floor.

34.    In late 2010, after repeated pressure to take a buyout and growing tired of Defendants' consistent failure to make necessary repairs in the apartment, Ms. Sanchez and her family moved out, accepting a fifteen-thousand (15,000) dollar buyout. On information and belief, the individual who paid them was Hasidic Jewish and an agent of Defendants.

35.    Juana Moreno and Oscar Melendez lived in Apartment 4R with their family until 2011. In 2011, after being offered a buyout on three (3) separate occasions, Ms. Moreno and her

8

family also accepted a twenty-five thousand (25,000) dollar buyout for reasons similar to those stated to the aforementioned tenants.

36.     Conditions of disrepair in Ms. Moreno's apartment included, but were not limited to, black mold on the walls and ceilings throughout the apartment, lack of water-proof sheet rock in areas where mold was previously removed, lack of electrical ventilation in the ceiling, and cracked floor tiles in the kitchen and bedrooms.

37.     During her entire tenancy, the only time Ms. Moreno remembers receiving repairs in her apartment was after the Tenants Association commenced an Article 7A Proceeding in New York City Housing Court (Kings County).[9]  A 7A Administrator was appointed to monitor the Premises until 2001, when GHT Realty Corp. regained control.

38.     In 2011, Gavino Maintenance Inc., the management company hired by Defendants 273 Lee Realty LLC and Steinmetz that same year, did a gut renovation of Apartments 2L and 4R.

39.     In 2012, Ortilio Herrera and Elia Duram, who lived in Apartment 2R, also accepted a buyout offer for similar reasons as those outlined above.

40.     Conditions that required repair in Apartment 2R included, but were not limited to, large holes created by rat infestations, chipped and stained ceramic bathroom tiles, slanted and broken kitchen floor tiles, rotted cabinets, a warped kitchen counter top, leaks, and a cracked living room ceiling.  Defendants were notified that these conditions of disrepair existed, but repairs were never made.

---

[9] An Article 7A proceeding is a case brought by at least 1/3 of the tenants in a building when conditions dangerous to life, health and safety, or a pattern of egregious conduct by the owners or his agents of harassment, illegal eviction, continued deprivation of services or other acts dangerous to life, health and safety, have existed at a building for at least 5 days. New York City Housing Courts in the applicable county will appoint an administrator to provide needed services and repairs. The original Tenants Association filed a notice of motion for a 7A administrator for the first time in 1998, which was granted by the Court in June 1999. The administrator, David Pagan, was in place until 2001, when GHT Realty Corp. regained control over the building.

9

41.     After Defendants' buyouts of the Latino tenants in Apartments 3R, 2L, 4R, and 2R, Plaintiffs Sara Oyola, Kathleen Santiago, and Cindy Sanchez, and their respective families, were, and still are, the only remaining Latino tenants at the Premises, and comprise Plaintiff 273 Lee Avenue Tenants Association.

42.     Plaintiff Oyola resides in Apartment 1L at the Premises with her daughter and her grandson; she has resided there since 1988.

43.     Plaintiff Santiago resides in Apartment 1R at the Premises with her partner, her sons, and her granddaughter; she has resided there since 1985.

44.     Since 1979, Plaintiff Santiago has received supplemental security income on the basis of an affective disorder.

45.     Plaintiff Sanchez resides in Apartment 3L of the Premises with her parents and her son; she has resided there since 1995.

46.     With the exception of the Plaintiffs and their families, all the residents at the Premises are Hasidic Jewish.

**B.     Defendants' General Treatment of Latino Tenants at 273 Lee Avenue**

47.     All of the Latino tenants residing at the Premises who eventually came to form the original 273 Lee Avenue Tenants Association, including the individual Plaintiffs in this action, have consistently experienced severe harassment and discrimination at the hands of the various Hasidic Jewish landlords to own the Premises since 1996,[10] including Defendants 273 Lee Realty, LLC and Naftali Steinmetz, and the agents thereof.

---

[10] *See supra*, para 4.

48.     Since Defendants 273 Lee Realty, LLC and Steinmetz became the owners of 273 Lee Avenue in 2006,[11] Plaintiffs have not only lived with various conditions of disrepair and a lack of a services, despite their requests for assistance, but they have also suffered the indignity of watching Defendants perform preferential repairs for, and provide superior services to, their Hasidic Jewish neighbors.

(i)     Changes in Management

49.     There have been at least seven (7) different management companies hired by Defendants since 2010: Plaza Management USA, Inc., GHT Realty LLC,[12] 273 Lee Realty LLC, Gavino Maintenance Inc., Complete Management, Premium Management, and most recently, YHT Management in January 2016.

50.     Except for the two most recent management companies, Plaintiffs were either informed of managerial changes after the change had occurred, or not at all, leaving them with no superintendent to contact for repairs and/or janitorial services during transitional periods. Plaintiffs found out about managerial changes either when they received rent invoices with a new name and/or address, or when they encountered new workers at the Premises.

51.     Additionally, there were two periods of time, first, from approximately 2005-2007, and second, during the winter months of 2014-2015, when there was no management company or superintendent for the Premises. There were no Hasidic Jewish tenants living at the building during this period.

---

[11] A February 2006 deed transferring property from G.H.T. Realty Corp. to Defendant 273 Lee Realty, LLC indicates Defendant Steinmetz's signature on behalf of the Defendant LLC.

[12] Plaintiff Oyola had a lease from GHT Realty LLC (i.e., the managing agent at the time), which appears to be a nominally separate entity from GHT Realty Corp (i.e., a prior owner). It should be noted, however, that GHT Realty LLC, which has the same mailing address as GHT Realty Corp., sent Plaintiffs Sanchez and Oyola rent invoices in 2010. Thus, there are points in time where the identity of the managing agent and/or owner of the premises is unclear.

52.     Furthermore, under all management companies hired by Defendants except for Premium Management, both the contact persons and workers provided to Plaintiffs differed from those provided to the building's Hasidic Jewish residents.

(ii)     Quality of Work Performed By Defendants' Agents

53.     From around 2009-2011, Plaintiffs primarily dealt with one male worker, who, on information and belief, was hired by Defendants, and made shoddy, incomplete, or non-existent repairs in the tenants' apartments. This male worker also told Plaintiff Oyola that he knew he was making poor repairs, but that Defendants had asked that he do them that way. The worker also told Plaintiff Sanchez that the tenants were requesting too many repairs for the amount of rent they were paying Defendants.

54.     Often times, the worker would make things worse or refuse to make the requested repairs. For example, Plaintiff Sanchez called the management office on one occasion to have her kitchen cabinet repaired; it was barely hanging onto the wall and was about to fall. The worker came to the apartment, shook the cabinet, and when it did not fall, told Plaintiff Sanchez that it was fine and did not need to be repaired or replaced. On another occasion, Plaintiff Sanchez asked him to repair a light in her bathroom. When he came to the apartment, he told Plaintiff Sanchez that an electrician was needed, but continued to fiddle with the light until it caused the entire apartment to blackout. He then left and did not return. No electrician ever visited the apartment.

55.     In 2009, while dealing with this worker, all Plaintiffs watched as Defendants' others workers—none of whom had ever made repairs in Plaintiffs' apartments—gut renovated Apartment 4L before the first Hasidic Jewish tenant of the building moved into said apartment later that year.

56.     In 2011, Plaintiffs lost the ability to use washing machines in their respective apartments. Defendants' aforementioned worker, along with a few of Defendants' other workers, came into Plaintiffs' apartments under the guise of making repairs and instead cut the water lines to their washing machines. After doing this, Plaintiffs received written notice from Defendants' agents that they were required to remove their washing machines by a certain date.

57.     Despite being told by Defendants' agents that they could not have or use washing machines in their apartments, Plaintiffs Oyola and Sanchez have seen washing machines and dryers being delivered and placed into the newly-renovated fourth floor apartments. To this day, Plaintiffs often hear washing machines running, can see smoke and smell laundry through the vents, and have seen a washing machine in at least one of their Hasidic Jewish neighbors' apartments (*see* ¶ 62 below). In addition, Plaintiffs' water pressure gets low when the machines are in use, and they often run out of hot water after hearing a washing machine run.

58.     Later in 2011, Defendants hired Gavino Maintenance Inc. to manage the Premises. Thus, a person the tenants knew as "Gavino" became the contact person for repairs or janitorial services on behalf of Defendants. Despite repeated attempts to contact Gavino and/or the management office, Plaintiffs rarely received repairs in their respective apartments. In contrast, on several occasions, Plaintiffs observed at least two of Defendants' workers from Gavino Maintenance Inc. making repairs to their Hasidic Jewish neighbors' apartments.

59.     When Plaintiffs did receive repairs from Gavino Maintenance Inc., they were piecemeal and substandard. For example, rather than repairing Plaintiff Sanchez's seriously damaged floor and/or leaking kitchen sink, Defendants' agent, Gavino, and his workers placed sticky tiles over the damaged floor and would quickly tighten pipe washers, creating temporary fixes to permanent problems.

60.     Upon completing this rushed and inferior work in Plaintiffs' apartments, Gavino and other agents of Defendants' would go upstairs to either make repairs for Plaintiffs' Hasidic Jewish neighbors or to help with the gut renovations of Apartments 2L and 4R occurring at this time.

61.     In or around 2011 and continuing into 2012, as these gut renovations in Apartments 2L and 4R continued under Gavino Maintenance Inc., Plaintiffs observed as Defendants' agents carried brand new appliances, such as refrigerators and washing machines, still in boxes, and new materials, such as marble, wood paneling, paint, and cabinets, upstairs to vacant apartments and those of their neighbors.

62.     Plaintiff Sanchez remembers, in or around 2015, seeing the results of this work, when she was allowed inside the apartment of her Hasidic Jewish neighbor in 2R, and marveling at its new tiling, flooring, countertops, and appliances, including a brand new washing machine.[13]

63.     In stark contrast, Plaintiff Oyola's bedroom was painted a dark blue with paint that Defendants' workers had found leftover in the basement. Her apartment has old, worn out tiling, flooring, countertops, outdated appliances, and no washing machine.

64.     One of Defendants' workers under Gavino Maintenance Inc., Ishmael, who was responsible for cleaning the building and disposing of its trash, repeatedly apologized to Plaintiff Oyola about the condition of her apartment. Ishmael expressed his wish to help Plaintiff Oyola more, but explained that Defendants were not going to do anything to assist her and/or the other Latino tenants.

---

[13] In late April/early May 2016, Plaintiff Sanchez again saw a washing machine in Apartment 2R.

14

65.     Plaintiff Sanchez had similar encounters with Defendants' worker Ishmael, where despite his willingness to help her, he explained that Defendants did not want him to make quality repairs to her apartment. Often times, Ishmael would create temporary fixes, and a few days later, the problem would reappear.

66.     In or around the winter of 2014, Gavino Maintenance Inc. ceased management of the Premises, and Defendants left Plaintiffs with no contact information for repairs and services. Plaintiffs had a severe heat problem during this time period, which is further explained in subsection C(i), "Inadequate Heat", below.

67.     Defendants did not hire a new management company until January 2015, leaving the tenants without anyone to contact about the major heat problem for several months.

## C.     Specific Instances of Defendants' Discriminatory Conduct Against Plaintiffs

68.     While Plaintiffs have consistently lived in substandard conditions due to Defendants' deliberate disregard and mistreatment of them, there are three specific instances that epitomize the extent to which Defendants have engaged in discriminatory conduct against Plaintiffs: (i) failure to provide adequate heat throughout the Premises on weekends; (ii) failure to repair severe and dangerous conditions in Plaintiff Oyola's bathroom; and, (iii) failure to properly secure the building's entrance door and Plaintiffs' individual apartment doors, all of which are elaborated below.

### (i)     No Heat in Plaintiffs' Apartments

69.     Since 2009, the Latino tenants at the Premises, including Plaintiffs in this action, have lived with a lack of heat during months in which state and local statutes require that an owner provide adequate heat.[14]

---

[14] According to New York City's Housing Preservation and Development's website, the Premises has had three heat and hot water lawsuits filed by the City's Housing Litigation Division against Defendant Steinmetz; the first in

70.     Prior to 2009, Plaintiff Oyola had the thermostat for the entire building within her apartment. Around the time that the first Hasidic Jewish tenant moved into Apartment 4L in late 2009, however, the thermostat was moved from Plaintiff Oyola's apartment into Apartment 4L. Since that time, Plaintiffs have experienced issues with adequate heat in their apartments, particularly on the weekend.

71.     During winter months, Plaintiffs observe their Hasidic Jewish neighbors taking buses on Friday evenings, around 5:00 p.m., with baby carriages and suitcases in tow, and returning on the same buses on Sundays around 6:00 p.m.

72.     On the weekends, Plaintiffs were left with no heat, requiring them to call whichever management company they believed to be in charge at that time. Upon information and belief, this was because the tenant(s) living in Apartment 4L would turn the heat off before they left for the weekend.

73.     In 2010, Plaintiff Sanchez discovered that the thermostat had then been moved to Apartment 2L when she went upstairs to try and ask her Hasidic Jewish neighbor in Apartment 4L to turn the heat up.

74.     This problem persisted and only became worse in the winter of 2014, when Gavino Maintenance Inc. ceased management of the Premises with no notice provided by Defendants to Plaintiffs. Plaintiffs called Gavino and left messages, but eventually their calls went straight to voicemail. With no number to call for assistance, Plaintiffs could only call 311 in the hopes of having their heat restored.

---

January 2011, the second in February 2013, and the third in February 2014.

16

75. Plaintiffs lived without adequate heat on the weekends for several months. It was not until January 2015 when Defendants hired Premium Management that the heat problem finally began to be addressed.

76. Around or some time shortly after October 2015, Defendants' agents moved the thermostat to the second floor hallway, but it was covered and locked in a plastic box; Plaintiffs were told by Defendants' agents that the Hasidic Jewish tenant in Apartment 4L had the key. However, the Hasidic Jewish tenant who had lived in Apartment 4L had moved out around five (5) months prior, in June 2015, leaving Apartment 4L vacant.

77. It was not until mid-November 2015 that Defendants' agents removed the locked plastic box from the thermostat at the behest of Plaintiffs' attorneys. Despite this measure, Plaintiffs did not receive authorization to use or instructions on how to use the thermostat.

78. Moreover, Defendants' discriminatory treatment of Plaintiffs persisted in many other ways.

(ii)    Plaintiff Oyola's Bathroom: Apartment 1L

79. In May 2015, the English-speaking supervisor and Defendants' agent, Devi, called Plaintiff Sanchez, who lives in Apartment 3L, asking for immediate access to her apartment due to an emergency in Apartment 2L, the apartment of the Hasidic Jewish tenant located directly beneath hers.

80. Devi explained that the tenant in Apartment 2L was experiencing a leak every time someone in Plaintiff Sanchez's apartment took a shower or ran water. Plaintiff Oyola, who lives in Apartment 1L, directly beneath Apartment 2L, however, had been experiencing the same leak for over a year, since at least May 2014, and had apprised Defendants agents as soon as it had begun.

17

81. Despite Plaintiff Sanchez's response that it was the old pipes throughout the building that were causing the problem, Devi insisted on sending a plumber to her apartment. Because Plaintiff Sanchez was at work, they agreed that Defendants' hired plumber would come at 7:00 p.m. that same night.

82. After Defendants' plumber inspected Plaintiff Sanchez's bathroom, he determined that her apartment did not contain the problem; Defendants' plumber then went to Apartment 2L, broke down the bathroom wall, and discovered that a broken pipe was causing the leak.

83. Fixing the broken pipe, however, required the plumber to access Plaintiff Oyola's bathroom in Apartment 1L, which is directly beneath the bathroom in Apartment 2L.

84. Upon entering Plaintiff Oyola's bathroom, Defendants' workers broke down the walls of Plaintiff Oyola's shower with a sledgehammer in order to reach the pipes.

85. While the leak and walls of Apartment 2L's bathroom were fixed that same evening, Plaintiff Oyola's shower walls remained unfixed and covered with a flimsy sheet of plastic for three (3) months.

86. In July 2015, when Defendants' workers eventually came to repair Ms. Oyola's bathroom walls, they only used plastic panels.

87. Around the time of this leak in early 2015, Plaintiff Oyola's ceiling light, which was also missing a light cover, began leaking an unidentified liquid from around the light bulb, causing a potentially dangerous electrical hazard for Plaintiff Oyola and her family.

88. Despite making Defendants aware of the constant light leak, it remained unrepaired and only stopped in January 2016 when the Hasidic Jewish tenants in Apartment 2L, the apartment above Plaintiff Oyola, vacated and Defendants began renovating that apartment.

18

89.    Also in January 2016, in an incident unrelated to the ceiling leak, the bathroom sink began overflowing, causing damage to the floor in Plaintiff Oyola's bathroom and kitchen. The water from the sink had murky, putrid, and foul-smelling water coming from it.

90.    The bathroom sink leak remained constant for several weeks, sometimes leading to inches of water flooding the bathroom, which Plaintiff Oyola would discover frequently when returning home from work each day.

91.    The leak eventually became so bad that Ms. Oyola cut out a portion of her bathroom's wooden door, so that the door, which had swollen from the water, could properly close. Furthermore, Plaintiff Oyola's kitchen floor, which is adjacent to the bathroom, became warped due to water damage. Plaintiff Oyola also had to cover the floor with a board for almost a month to protect her young grandchild and other family members from injury.

92.    Since the leak began, Plaintiff Oyola, her daughter, and a tenant advocate from Los Sures contacted Defendants' agents at least *six (6) times*. During the time that Plaintiff Oyola lived with this leak, she personally observed Defendants' workers conducting renovation work within the vacant apartments at the Premises.

93.    It was not until February 10, 2016, after more than three (3) weeks of consistent leaking, that one of Defendants' workers merely inspected the leak and damaged floor. Another of Defendants' workers arrived later that day only after Plaintiff Oyola's daughter protested that no repairs had been done. This second worker "snaked" the sink, but did not fix the floor.

94.    Despite Plaintiff Oyola's repeated attempts to arrange repair dates with Defendants' agents regarding the continued leak and the floor, the agents either refused every date given by Plaintiff Oyola, or did not answer her phone calls. As a result of the lack of repairs, Plaintiff Oyola, along with Plaintiffs Santiago and Sanchez, brought an HP proceeding in

19

Housing Court.[15] It was not until after four (4) months of litigation in the HP proceeding that these necessary repairs were nearly completed, albeit shoddily. Plaintiff Oyola's bathroom door, however, which has been replaced twice, is still in violation of New York City Housing Maintenance Code Section 27-2005.[16]

95.    In early June 2016, Plaintiff Oyola's bathroom door was replaced by Defendants' agents as of January 2016, YHT Management, with a wooden door that was warped, serrated and sharp at the edges, and crooked on the top and bottom.

96.    The numerous and protracted ordeals Plaintiff Oyola has had to go through in seeking basic repairs and services that are mandated under various local and State statutes and regulations, indicates a pattern and practice by Defendants to make Plaintiff Oyola's, and all other Latino tenants', living situations unpleasant and untenable—the ultimate goal being to rid the building of all non-Hasidic Jewish tenants through such illegal discriminatory treatment.

(iii)    Plaintiffs' Access to Building and Apartments

97.    Plaintiffs have also experienced countless problems with their building's main entrance doors and the doors of their respective apartments.

98.    All of Plaintiffs' apartment doors have key locks, while their Hasidic Jewish neighbors have number combination locks. Plaintiffs Oyola and Sanchez have had, for as long as they can remember, recurring issues with their apartment doors.

---

[15] An HP is a type of case brought by a single tenant or a group of tenants in the same building, who ask the court to: (1) register certain conditions as violations of the New York City Housing Maintenance Code and ordering the landlord to correct them within a specified period of time, and/or (2) direct HPD to collect penalties for violations it has recorded but not collected on. Plaintiff Tenants Association brought an HP in April 2016, Index Number 1085/2016.

[16] The Class B violation states the following: "replace with new the broken or defective entrance door in the bathroom located at apt 1I, 1st story, 1st apartment from north at east." It can be found on HPD Building Info, at https://hpdonline.hpdnyc.org/HPDonline/provide_address.aspx.

99.    Recently, in early 2016, one of Defendants' repairmen attempted to fix Plaintiff Oyola's door. Defendants' repairman, however, made the door worse, and Defendants neglected to send any other worker to fix the door. It sometimes takes Plaintiff Oyola thirty (30) to forty-five (45) minutes of jiggling the key to get her apartment door unlocked.

100.    Similarly, in March 2016, one of Defendants' workers came to Plaintiff Sanchez's apartment to install window guards, and without consent or cause, did work on her apartment's front door, which now does not close properly. On information and belief, the door's inability to close is a fire hazard.

101.    In contrast, in April 2016, Plaintiff Sanchez's Hasidic Jewish neighbor in Apartment 2R had an issue with her combination lock, and Plaintiff Sanchez witnessed Defendants' workers immediately and correctly replace the lock.

102.    Most recently, Plaintiffs experienced constant issues with the front door, which was replaced in or around June 2016.

103.    In July 2016, Plaintiff Oyola called the Fire Department, after being unable to reach anyone from YHT Management, because the front door to the Premises would not open, and no one could get in or out of the building. In fact, Plaintiff Oyola's daughter had to climb out of the window to get to work that morning.

104.    Upon information and belief, the Hasidic Jewish tenants were not in the building when this incident occurred.

105.    On August 3, 2016, Plaintiffs' counsel apprised YHT Management that Plaintiff Sanchez was locked out of the building and having issues with the building's combination code. YHT Management responded by contacting Plaintiffs' counsel via email, stating that the tenants

21

living in Apartments 2R and 3R, both of whom are Hasidic Jewish, were locked out of the building.

106.    YHT Management, as an agent of Defendants, alleged in its email that one of the Plaintiffs broke open the lock, that Plaintiffs were "making trouble", and that "**WE DID NOT CHANGE THE CODE. THIS MUST HAVE BEEN DONE BY YOUR CLIENTS.**" (bold and full caps as in original electronic correspondence, on file with undersigned counsel).

## D.    Housing Court Litigation Between Plaintiffs and Defendants

### (i)    Case Overviews

107.    Since 2006, there have been at least fifteen (15) cases between Plaintiffs and Defendants,[17] and one case commenced by HPD against Defendants in relation to the Premises.[18] Three (3) nonpayment cases were brought by a prior owner, but continued by Defendants when they purchased the Premises in 2006; six (6) nonpayment cases and (2) owner-use holdovers have been brought by Defendants against Plaintiffs, and; one 7A Petition and three (3) HP cases have been brought by Plaintiffs against Defendants.

108.    The fact that Defendants have brought seven (7) cases, and chose to continue three (3) immediately upon purchasing the Premises, further demonstrates their general mistreatment and harassment of Plaintiffs.

109.    In August 2006, Defendants took over the prior owner's summary eviction proceedings against Plaintiffs Oyola and Santiago, and Plaintiff Sanchez's parents, Gaspar and

---

[17] All fifteen (15) of these cases have been commenced before the Civil Court of the City of New York, County of Kings.  Furthermore, although past members of the Tenants Association were involved in cases, only the individual Plaintiffs are referenced herein.

[18] *See supra* Note 14.

22

Julia Sanchez.[19]  Plaintiffs were on rent strike due to severe conditions of disrepair in the common areas at the Premises and in their respective apartments, in violation of city housing codes, which were largely, if not entirely, ignored by the prior owner.[20]  These cases were settled pursuant to a stipulation on September 19, 2006 with rental abatements for violations of the warranty of habitability.

110.    In August 2009, Defendant 273 Lee Realty, LLC, commenced nonpayment eviction proceedings against Plaintiffs Santiago and Mr. and Mrs. Sanchez.[21]  In March of the following year, Plaintiffs Oyola and Santiago, Mr. Sanchez, and the rest of the members of the Tenants Association at that time filed an Article 7A Proceeding.[22]  The nonpayment eviction proceedings and the 7A proceeding were settled pursuant to a stipulation on October 5, 2010, with a twenty (20) percent rent abatement in exchange for discontinuance of the Article 7A Proceeding.

111.    In January 2011, Defendant 273 Lee Realty, LLC sent Plaintiffs Oyola and Santiago Five Day Notices regarding rent allegedly owed and commenced a nonpayment

---

[19] *199 Lee Realty LLC v. Sara Oyola*, Index No. 88511/2006; *199 Lee Realty LLC v. Kathleen Santiago*, Index No. 81884/2006, *199 Lee Realty LLC v. Gasper Sanchez, et al.*, Index No. 88520/2006.

[20] A rent strike involves the banding together of a group of tenants, commonly in a tenants association, who refuse to pay rent until the landlord responds to the tenants' collective demands.  The Tenants Association has been on rent strike since, at least, 2011.  As part of the rent strike, the Tenants Association opened a bank account and each tenant has deposited their monthly rent into said account.  As such, all of the nonpayment proceedings brought by Defendants against Plaintiffs are a result of Plaintiffs being on rent strike.

[21] *273 Lee Realty LLC v. Kathleen Santiago*, Index No. 92114/2009, *273 Lee Realty LLC v. Gasper Sanchez, et al.*, Index No. 92115/2009.

[22] *In the Matter of the Application of Sara Oyola, Kathleen Santiago, Socorro Herrera, Gaspar Sanchez, and Juana Moreno, for a Judgment, pursuant to Article 7A of the Real Property Actions and Proceedings Law, appointing a court designated administrator for the premises known as: 273 Lee Avenue, Brooklyn, New York 11206*, Index No. 59356/2010.

proceeding against Mr. and Mrs. Sanchez.[23]  Cases against Plaintiffs Oyola and Santiago were never brought, and the case against Mr. and Mrs. Sanchez was withdrawn in February 2011.

112.   In or around March 2011, Defendant Steinmetz commenced owner's use holdover eviction proceedings against Plaintiffs Santiago and Oyola, which is further explained in subsection D(ii) below.

113.   In December 2012, Plaintiffs brought an HP proceeding against Defendants, which was discontinued via stipulation on July 1, 2014, with the Defendant agreeing to make certain repairs at the Premises.[24]

114.   In May 2014, Plaintiffs brought an HP proceeding against Defendant Steinmetz for failing to make the agreed-upon repairs in the 2012 HP proceeding.  The 2014 HP proceeding was discontinued via stipulation on November 1, 2014, with the Defendant agreeing to make certain repairs at the Premises.[25]

115.   In around October 2014, Defendant Steinmetz commenced, before the Civil Court of the City of New York County of Kings, a summary eviction nonpayment proceeding against Mr. and Mrs. Sanchez.[26]  The nonpayment eviction proceeding was eventually set for trial, which began on July 28, 2015 and settled that day with a forty (40) percent rent abatement.

116.   In around February 2016, Steinmetz commenced, before the Civil Court of the City of New York County of Kings, a summary eviction nonpayment proceeding against Mr. and

---

[23] *273 Lee Realty LLC v. Gasper Sanchez, et al.*, Index No. 52954/2011.

[24] *Sara Oyola, Kathleen Santiago, and Gaspar Sanchez v. Naftali Steinmetz and 273 Lee Realty LLC. and Department of Housing Preservation and Development*, Index No. 6847/2012.

[25] *Sara Oyola, Kathleen Santiago, and Gaspar Sanchez v. Naftali Steinmetz and Department of Housing Preservation and Development*, Index No. 6318/2014.

[26] *Steinmetz v. Gaspar Sanchez et al.* Index No. 96829/2014.

24

Mrs. Sanchez, which was settled via stipulation on July 8, 2016.[27]  In August 2016, Defendant made a motion to restore the nonpayment proceeding to the court calendar alleging that Plaintiff Sanchez and her family had violated the terms of the stipulation.  Plaintiffs' counsel put in an affirmation in opposition, and on September 1, 2016, oral arguments were heard.  The Judge reserved decision, which is still pending.

117.    In April 2016, Plaintiffs brought an HP proceeding against Defendant Steinmetz, which was settled via stipulation on July 22, 2016.[28]

(ii)    Ongoing Owner's Use Holdover Eviction Proceeding Against Plaintiffs Oyola and Santiago

a.    **Commencement**

118.    According to public records available on the New York City Automated City Register Information System ("ACRIS"), in or around December 2010, Defendant 273 Lee Realty, LLC transferred the deed of the Premises from itself to Defendant Steinmetz.  Defendant Steinmetz signed on behalf of Defendant 273 Lee Realty, LLC.

119.    In January 2011, the following month, Defendant Steinmetz served notices upon Plaintiffs Santiago and Oyola, commencing owner's use holdover eviction proceedings under New York law, commonly referred to as "Golub notices".  These are predicate notices that must be served before an owner's use holdover (tenant eviction) proceeding can be formally initiated in Housing Court.[29]

120.    Title 9 of the State of New York Code, Rules and Regulations ("NYCRR") Section 2524.4, permits the owner of a rent-stabilized housing accommodation to avoid its

---

[27] *Steinmetz v. Gaspar Sanchez et al*, Index No. 55388/2016.

[28] *Sara Oyola, Kathleen Santiago, and Gaspar Sanchez v. Naftali Steinmetz and Department of Housing Preservation and Development*, Index No. 1085/2016.

[29] *See* Rent Stabilization Code § 2524.2[a].

obligation to provide a renewal lease to the inhabiting tenant, and to recover possession of said housing accommodation, "for such owner's personal use and occupancy as his or her primary residence ... and/or for the use and occupancy of a member of his or her immediate family as his or her primary residence ...."

121.    State law prescribes that only a natural person may commence an owner's use holdover, which, on information and belief, was the reason for the deed transfer by Defendant Steinmetz from the Defendant LLC, of which he is the sole member, to himself naturally.

122.    In the Golub notice served upon Plaintiff Santiago, Defendant Steinmetz asserts the following as factual grounds for the owner's use holdover:

> Owner's daughter [Frumit Stauber] and son-in-law [Cheskel Stauber] are currently residing with their child in a one and a-half bedroom apartment on the fifth (5th) floor of a condominium unit with no lease. The owner of said unit has notified them of his intent to seek their ouster within the next six (6) months and as such unit is not regulated, and their defenses to any subsequent eviction are almost nil, they will find themselves homeless. Ancillary to same, they are also paying a high rental of $1600.00 per month and the owner is threatening to raise same to over $2000.00.

123.    In the Golub notice served upon Plaintiff Oyola, Defendant Steinmetz asserts the following as factual grounds for the owner's use holdover:

> Owner's daughter [Sura Tyrnaur] and son in law [Hertzke Tyrnaur] are currently residing with their three (3) minor children in a one and ¾ type bedroom apartment, which, they have recently discovered, is an illegal apartment. It is a cramped apartment on the third (3rd) floor which has no fire escape and no means of escape should a fire or other disaster occur. Furthermore, they have no lease and they need to leave the unit in its sordid and illegal condition as soon as possible.

124.    In or around March 2011, after serving Plaintiffs with the requisite predicate Golub notices, Defendant Steinmetz commenced owner's use holdover proceedings against Plaintiffs Santiago and Oyola. The proceedings, still pending before the Court, are *Steinmetz v. Santiago*, Index No. L&T 70327/2011 and *Steinmetz v. Oyola*, Index No. L&T No. 70336/2011 ("Holdover Proceedings").

26

### b.    Available Apartments for Plaintiffs in the Building

125.    The Owner's Use Proceedings were joined together and initially set for trial in June 2013. On said trial date, Defendant Steinmetz settled the Owner's Use Proceedings with an agreement, *inter alia*, to have Plaintiff Santiago move to a vacant apartment on the second floor of the Premises.

126.    However, as summarized in *Steinmetz v. Santiago*, 46 Misc.3d 1225(A), 2015 N.Y. Misc. LEXIS 681 (N.Y. Civ. Ct. Mar. 10, 2015), Defendant Steinmetz reneged on the settlement agreement shortly after agreeing to it in June 2013.

127.    After Defendant Steinmetz reneged, the second-floor apartment that had been vacant was rented out to, or otherwise became occupied by, a Hasidic Jewish family.

128.    Despite the allegation of an emergency in the Golub notices, it was not until *nine (9) months* later that Defendant Steinmetz filed a motion to restore the Holdover Proceedings after having taken steps to ensure that he would be able to recover use-and-occupancy against Plaintiffs Santiago and Oyola. *See id.*

129.    The Holdover Proceedings were restored to the Civil Court's calendar in or around March 2015 for settlement and/or trial and a hearing on use-and-occupancy. *Id.*

130.    In or around April 2015, Defendant Steinmetz, through counsel, proposed a second settlement agreement to Plaintiffs Oyola and Santiago. Among the terms of the settlement, Defendant Steinmetz agreed to relocate Plaintiffs Oyola and Santiago to vacant apartments in other buildings in the neighborhood because there were no vacancies at the Premises.

131.    In or around June 2015, Defendant Steinmetz, again through his counsel, provided Plaintiffs Oyola and Santiago with a list of eleven (11) vacant apartments.

132. All eleven (11) vacant apartments were located in buildings receiving government subsidies, which would require a person to apply through official governmental channels in order to legally reside there. A landlord like Defendant Steinmetz would not be able to simply make these apartments available for rental by the tenants, as he offered to do in order to satisfy the terms of his settlement agreement with Plaintiffs.

133. Furthermore, contrary to the settlement terms, a majority of the apartments were located in Bushwick or Bedford-Stuyvesant, and none were located in the now Hasidic Jewish section of Williamsburg, the neighborhood that Plaintiffs Oyola and Santiago have lived in for about two decades, and where the Premises is located. On information and belief, offering Plaintiffs apartments located solely in Bushwick or Bedford-Stuyvesant was part of Defendants' pattern or practice of further segregating the now Hasidic Jewish section of Williamsburg.

### c. Defendant's Relevant Responses Provided in Discovery

134. According to Defendant Steinmetz's responses to interrogatories and a notice to produce in the Holdover Proceedings, as of October 2011, he owns a 10% interest in four (4) limited liability companies owning property in Connecticut and an unspecified number of other entities in which he has less than a 5% interest and which own property in New York and Connecticut. Also in response to said interrogatories and a notice to produce, Defendant Steinmetz's daughters, Frumit Stauber and Sura Tyrnaur, lived at 399 Marcy Avenue, 5th Floor and 174 Lynch Street, 3rd Floor, Brooklyn, New York 11206, respectively. in 2011.

135. According to Defendant Steinmetz's responses to a notice to produce in the Holdover Proceedings, as of October 2011, no employee, relative, or associate owner of Defendant Steinmetz occupied any unit in any other property he owned, despite the urgent reasons stated by Defendant for bringing the holdover eviction proceedings against Plaintiffs.

### d.   Trial

136.   The Owner's Use Proceedings trial began on June 23, 2016 in Kings County Housing Court with the testimony of Ms. Stauber and Ms. Tyrnaur.

137.   Despite the allegations of the Golub notice, Ms. Stauber testified that she continued to live on the fifth floor of 399 Marcy Avenue until six (6) months prior to the trial date.   For the last two months, she has lived in an apartment on the third floor of 223 Lee Avenue, Brooklyn, New York 11206.

138.   Ms. Stauber also testified, upon being questioned during direct examination, that she would move into 273 Lee Avenue as soon as the apartment was made "decent."

139.   Despite the allegations of the Golub notice, Ms. Tyrnaur testified that she continued to live on the third floor of 174 Lynch Street until two-and-a-half (2 ½) years ago, at which time she and her family moved to their current residence at 252 Hayward Street, third floor, Brooklyn, New York 11206.

140.   Defendant Steinmetz also testified on June 23, 2016, admitting, among other things, that he owns units within several buildings in the Williamsburg neighborhood and/or Brooklyn borough; rents said units out to friends; is building a four-story residential building in Brooklyn; and has never thought to move his daughters into the vacant units of the Premises or into any of the other units he owns throughout the borough.

141.   The foregoing facts demonstrate that the Defendants' Holdover Proceedings are merely a pretext to rid the building of its Latino tenants and provide their vacant apartments to members of the Hasidic Jewish community.

### e.    Vacancies at the Premises

142.    As stated in Plaintiff Sanchez's affidavit dated October 8, 2015 (annexed as an exhibit to a motion for summary judgment in the Owner's Use Proceedings court file), in June 2015, Apartment 4L became vacant on the Premises, and in September 2015, Apartment 2R became vacant in the Premises. Thus, two apartments in the building were vacant.

143.    In or around December 2015 or January 2016, two more apartments within the Premises, Apartments 2L and 4R, became vacant.

144.    There are no known advertisements for available apartments on the premises.

145.    In or around January 2016, two Hasidic Jewish families moved into Apartments 2R and 2L.

146.    On or about January 3, 2016 in the evening, a Hasidic Jewish man and his family came to the Premises and spoke with Plaintiff Sanchez.

147.    The man asked Plaintiff Sanchez if she lived on the Premises and how many Jewish people lived on the Premises. He stated that his wife had spoken to someone managing the building who had said there were apartments available on the second and fourth floor.

148.    On information and belief, none of the four apartments were vacant during the autumn of 2015, and those still presently vacant have never been advertised as being vacant.

149.    As of the date of this writing, at least Apartments 4R and 4L are still vacant.

150.    As of the date of this writing, Defendant Steinmetz refuses to offer Plaintiffs Oyola or Santiago either of the vacant apartments.

30

## FIRST CLAIM FOR RELIEF

*(Fair Housing Act - 42 U.S.C. § 3601, et seq.)*

151.    Plaintiffs restate and incorporate by reference the preceding paragraphs as if fully set forth herein.

152.    Section 3604(b) of the Fair Housing Act, prohibits discrimination against any person in the terms, conditions, or privileges of rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, on the basis of race, color, national origin, or religion.

153.    Defendants are "persons" within the meaning of 42 U.S.C. Section 3602.

154.    Plaintiffs are of Latina heritage or immigrant status, which constitutes a "race," "color," or "national origin" within the meaning of 42 U.S.C. Section 3604.

155.    Hasidic Judaism, which none of Plaintiffs, as persons, profess or practice, is a "religion" within the meaning of 42 U.S.C. Section 3604.

156.    273 Lee Avenue, Brooklyn, New York 11206 is a "dwelling" within the meaning of 42 U.S.C. Section 3602(b).

157.    In contravention of 42 U.S.C. Section 3604(b) as clarified by 24 CFR Section 100.65, Defendants have discriminated against Plaintiffs in the terms, conditions, or privileges of renting in New York City, or in the provision of services or facilities in connection with such dwelling on the basis of Plaintiffs race, color, national origin, or religion by acts and omissions, including omission of legal duties, stated above in the facts section, including but not limited to, failure to provide them with repairs and adequate heat.

158.    Plaintiffs are "aggrieved person[s]" within the meaning of 42 U.S.C. Section 3602(i) because, as a direct and proximate result of Defendants' acts and omissions, including

31

omission of legal duties as stated in the facts section above, its members have been injured by both the physical lack, and mental consequences, of, not receiving repairs to, and services at, their respective apartments, while similarly situated neighbors have consistently received such repairs and services.

159.    Accordingly, under  42 U.S.C. Section 3613(c), Plaintiffs are entitled to: (i) a permanent injunction prohibiting Defendants from treating Plaintiffs in a discriminatory way; (ii) the appointment of a monitor to ensure compliance with court orders and fair housing laws; (iii) actual and punitive damages; (iv) costs and attorneys' fees; and, (v) any other relief this Court deems appropriate.

## SECOND CLAIM FOR RELIEF

*(New York State Human Rights Law – Executive Law § 296, et seq.)*

160.    Plaintiffs restate and incorporate by reference the preceding paragraphs as if fully set forth herein.

161.    New York Executive Law Section 296(5) prohibits discrimination against any person in the terms, conditions, or privileges of the rental or lease of a housing accommodation or the furnishing of facilities or services in connection with such housing accommodation on the basis of race, color, national origin, or creed.

162.    Plaintiffs' apartments are "housing accommodations" within the meaning of New York Executive Law Section 296(5).

163.    Hasidic Judaism, which none of Plaintiffs, as persons, professes or practices, is a "creed" within the meaning of New York Executive Law Section 296(5).

164.    Plaintiffs have suffered injury as a result of Defendants' illegal actions.

32

165.    Accordingly, under New York Executive Law Section 297(7), Plaintiff is entitled to: (i) a permanent injunction prohibiting Defendants from treating Plaintiffs in a discriminatory way; (ii) the appointment of a monitor to ensure compliance with court orders and fair housing laws; (iii) actual and punitive damages; (iv) costs and attorneys' fees; and, (v) any other relief this Court deems appropriate.

## THIRD CLAIM FOR RELIEF

*(New York City Human Rights Law –*
*New York City Adm. Code § 8-107, et seq.)*

166.    Plaintiffs restate and incorporate by reference the preceding paragraphs as if fully set forth herein.

167.    New York City Administrative Code Section 8-107(5)(a) prohibits discrimination against any person in the terms, conditions or privileges of the rental or lease of a housing accommodation or an interest therein or in furnishing of facilities in connection therewith on the basis of race, color, national origin, or creed.

168.    Plaintiffs' apartments are "housing accommodations" within the meaning of New York City Administrative Code Section 8-107(5)(a).

169.    Hasidic Judaism, which none of Plaintiffs, as persons, professes or practices, is a "creed" within the meaning of New York City Administrative Code Section 8-107(5)(a).

170.    Plaintiffs have suffered injury as a result of Defendants' illegal actions.

171.    Accordingly, under New York City Administrative Code Sections 8-502(a) and (f), Plaintiffs are entitled to:   (i) a permanent injunction prohibiting Defendants from its discriminatory conduct and ordering Defendants to provide Plaintiffs with heat on weekends or to make the heating apparatus available for them to operate during weekends; (ii) the appointment of a monitor to ensure compliance with court orders and fair housing laws; (iii)

33

actual or punitive damages; (iv) costs and attorneys' fees; and, (v) any other relief this Court deems appropriate.

## FOURTH CLAIM FOR RELIEF

*(Fair Housing Act - 42 U.S.C. § 3601, et seq.)*

172. Plaintiffs restate and incorporate by reference the preceding paragraphs as if fully set forth herein.

173. Section 3604(d) of the Fair Housing Act prohibits the refusal to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise making unavailable or denying a dwelling to any person on the basis of race, color, national origin, or religion.

174. 273 Lee Avenue, Brooklyn, New York 11206 and its vacant units are "dwellings" within the meaning of 42 U.S.C. Section 3602(b).

175. Defendants have represented to Plaintiffs or the general public that the dwelling is not available for inspection, sale, or rental when such dwelling is, in fact, so available as it has been shown to Hasidic persons for rent.

176. Plaintiffs are "aggrieved person[s]" within the meaning of 42 U.S.C. Section 3602(i) as clarified by 24 CFR Sections 100.60, 100.70, and 100.75, because, as a direct and proximate result of Defendants' acts and omissions, including Defendants' misrepresentations about the availability of vacant units at the premises, Plaintiffs have been injured in that they have been subject to eviction because of their race, national origin, or religion, and defendants have refused to negotiate with them for the rental of such vacant apartments.

177. Accordingly, under 42 U.S.C. Section 3613(c), Plaintiffs are entitled to: (i) a permanent injunction prohibiting Defendants from misrepresenting the availability of the

34

dwelling; (ii) the appointment of a monitor to ensure compliance with court orders and fair housing laws; (iii) actual or punitive damages; (iv) costs and attorneys' fees; and, (v) any other relief this Court deems appropriate.

## FIFTH CLAIM FOR RELIEF

*(Civil Rights Act of 1866 - 42 U.S.C. § 1982, et seq.)*

178. Section 1982 of the Civil Rights Act of 1866 provides that all citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold and convey real and personal property.

179. Defendants are "persons who place property on the market" within the meaning of 42 U.S.C. Section 1982.

180. Plaintiffs' Latino heritage or status as persons who are not Hasidic is a "race" within the meaning of 42 U.S.C. Section 1982.

181. By intentionally refusing to lease out vacant apartments to Plaintiffs described above in the "Facts" section, Defendants have discriminated against Plaintiffs by refusing to lease real property to them on account of their race in contravention of 42 U.S.C. Section 1982.

182. Plaintiffs have been injured as a direct and proximate result of Defendants' failure to lease vacant real property to them, and Defendants' simultaneous attempts to evict them from their rent-regulated housing. Moreover, the existence of the association itself is also thereby threatened.

183. Accordingly, under 42 U.S.C. Section 1982, Plaintiffs are entitled to: (i) a permanent injunction prohibiting Defendants from engaging in their discriminatory conduct of refusing to lease real property to the current Latino and non-Hasidic Jewish tenants; (ii) actual

and punitive damages; (iii) costs and attorneys' fees; and, (iv) any other relief this Court deems appropriate.

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

(A) A permanent injunction prohibiting Defendants from engaging in discriminatory conduct, including but not limited to, the types of discriminatory conduct recited above;

(B) A permanent injunction prohibiting Defendants from misrepresenting the dwellings as unavailable for inspection or rent when they are, in fact, so available;

(C) The appointment of a monitor to ensure compliance with court orders;

(D) Actual and punitive damages for Defendants' discriminatory conduct;

(E) Costs and disbursements incurred with this action, including reasonable attorney's fees and expenses under any statute or law authorizing the recovery of such costs, disbursements, fees, and expenses, and;

(F) Such other and further relief as this Court deems just and proper.


DATED:    Brooklyn, New York
          December 15, 2016


                                    _____
                                    Gregory E. Louis
                                    Sara J. Wolkensdorfer
                                    Shekar Krishnan
                                    *Of Counsel to Martin S. Needelman, Esq.*
                                    **Brooklyn Legal Services Corporation A**
                                    260 Broadway, Suite 2
                                    Brooklyn, New York 11211
                                    (718) 487-2300

36

Courtney E. Finerty
Frederick B. Warder III
**Patterson Belknap Webb & Tyler LLP**
1133 Avenue of the Americas
New York, New York 10036
Telephone: (212) 336-2000

37